GEORGE T. PAPPAS and VOULA G. PAPPAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DUTTONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pappas v. Commissioner
Docket Nos. 13862-80, 13863-80.
United States Tax Court
T.C. Memo 1981-639; 1981 Tax Ct. Memo LEXIS 107; 42 T.C.M. (CCH) 1598; T.C.M. (RIA) 81639; October 29, 1981. Jack H. Calechman, for the petitioners. David N. Brodsky, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Chief Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Docket No. 13862-80 (George T. Pappas and Voula G. Pappas *108 ) Underpayment
Addition to tax
Year
of tax
(Sec. 6653(b)) [1]
1974
$ 16,686.05
$ 8,343.03
1975
11,187.74
5,593.87
1976
4,084.90
2,042.45
1977
368.00
Docket No. 13863-80 (Duttons, Inc.) Taxable year
Underpayment
Addition to tax
ended
of tax
(Sec. 6653(b))
7/31/75
$ 13,514.71
$ 6,757.36
7/31/76
1,149.77
574.89
7/31/77
937.04
468.52
After concessions by respondent, the issues remaining for decision are: (1) whether petitioners had unreported income for each of the years in question; [2]
(2) whether the Pappases are entitled to dependency exemptions for Mrs. Pappas' nieces; (3) whether the petitioners are liable for the additions to tax under section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners George T. Pappas (Mr. Pappas) *109 and Voula G. Pappas (Mrs. Pappas) timely filed joint Federal income tax returns for the years in issue with the Internal Revenue Service Center, Andover, Massachusetts. At the time they filed their petition in this case, Mr. and Mrs. Pappas resided in Dorchester, Massachusetts. Petitioner Duttons, Inc. (Duttons) is a Massachusetts corporation with its principal place of business in Quincy, Massachusetts, at the time it filed its petition herein. For the taxable years in issue, Duttons timely filed its Federal income tax returns with the Internal Revenue Service, Andover, Massachusetts. During the years 1974 through 1977, Duttons owned and operated a restaurant located in Quincy, Massachusetts. The Pappases owned 100 percent of the stock of Duttons and were employed full-time by Duttons to operate the restaurant. Mrs. Pappas came to this country from Greece in 1948. In 1951, the Pappases opened a restaurant, Duttons, in Boston, Massachusetts. In 1968, Duttons was forced to relocate; the restaurant moved to its present location in Quincy. The Pappases lived modestly; they had no children and worked at Duttons seven days a week. In 1951, Mr. and Mrs. Pappas began saving *110 money from their wages at Duttons. The cash, originally stored in boxes throughout the Pappases' house, was later moved to a safe in the basement of their home. By January 1, 1974, the Pappases had accumulated $ 20,000. Of this $ 20,000, the Pappases deposited $ 14,000 in their various bank accounts in 1974 and deposited the remaining $ 6,000 in 1975. The Pappases had no accumulated cash on hand on January 1, 1976. During 1974 and 1975, Mr. and Mrs. Pappas made deposits to one joint checking account and two joint savings accounts. In 1976, the Pappases made deposits to one joint savings account and one joint checking account. In 1974 and 1975, deposits were also made to a joint savings account bearing the names of Mrs. Pappas and her brother, John Karrasas (Mr. Karrasas). Deposits to these six accounts totaled $ 56,426.76 in 1974, $ 43,024.87 in 1975 and $ 25,539.86 in 1976. In addition to the $ 20,000 accumulated cash, the Pappases' source of funds for each of the years in question was: 1974
1975
1976
Net Salary
$ 13,513.00
$ 6,118.16
$ 8,521.26
Rents
2,160.00
2,160.00
3,240.00
Pensions
4,020.00
4,020.00
4,020.00
Dividends
492.51
Total
$ 19,693.00
$ 12,298.16
$ 16,273.77
*111 Duttons maintained a general checking account and a payroll account during the years in issue. On its corporate Federal income tax returns for the taxable years ended July 31, 1975, July 31, 1976, and July 31, 1977, Duttons reported gross sales in the amounts of $ 324,995.09, $ 300,885.07, and $ 293,203.39, respectively. These amounts were deposited into Duttons' two checking accounts; the accounts reflect no deposits in addition to the reported amounts of gross sales. The Pappases wrote checks from their personal checking account payable to Duttons totaling $ 7,600 in 1974, $ 2,850 in 1975, and $ 13,300 in 1976. [3]
In 1960, Mrs. Pappas brought her sister and her sister's family over to this country from Greece. A year later her sister's husband died, leaving his wife and four daughters. During the years in issue, Mrs. Pappas assisted in the support of her nieces by buying them clothes. The children's mother also contributed towards their support. In 1974 and 1975, the Pappases claimed dependency *112 exemptions for three of Mrs. Pappas' nieces and in 1976 for two of her nieces. OPINION Respondent has determined that the petitioners have unreported taxable income for the years in issue. With respect to the Pappases, respondent calculates that the excess of bank deposits over the Pappases' net salary, rental income, pension, and reported dividends constitutes unreported income in the amount of $ 36,733.76 in 1974, $ 30,726.11 in 1975 and $ 9,266.09 in 1976. The source of these excess deposits, respondent contends, is distributions from Duttons. In turn, respondent has determined that Duttons has unreported taxable income in the amount of these distributions: $ 49,278.32, $ 5,110.76, and $ 6,700.00 for the taxable years ended July 31, 1975, July 31, 1976, and July 31, 1977. [4] Respondent asserts additions to tax pursuant to section 6653(b) against both the Pappases and Duttons based upon the fraudulent omission of taxable income from their returns. Mr. and Mrs. Pappas do not argue that the use of the bank deposits method as the basis *113 of respondent's asserted deficiencies is improper. Rather, the Pappases' position is that the excess deposits came from three nontaxable sources: prior accumulated cash; income of Mr. Karrasas; and loan repayments by Mrs. Pappas' brother-in-law (Mr. Psarros). [5]
At the trial, Mrs. Pappas testified that (1) from 1951 onward, she and her husband accumulated savings of approximately $ 50,000; (2) in 1973 or 1974, when the Pappases' basement was flooded, the money, kept in a safe in the basement, began to get moldy; (3) the Pappases then began to deposit the money in their bank accounts; and (4) the deposits were made in amounts of approximately *114 $ 1,000 to $ 2,000 and it took between one to two years to deposit the entire sum. Although Mrs. Pappas testified that the cash hoard totaled $ 50,000, respondent's agent testified that earlier Mrs. Pappas had told him that her cash hoard was approximately $ 20,000. The Pappases contend that respondent is erroneously treating, as theirs, funds belonging to a third party -- Mr. Karrasas. In support of that claim, Mrs. Pappas testified that (1) she and Mr. Karrasas opened a joint savings account (the Karrasas' account) into which funds of Mr. Karrasas were deposited in order to keep those funds beyond the control of Mr. Karrasas' wife (whom he was divorcing); (2) she then wrote checks from her and her husband's checking accounts to pay Mr. Karrasas' rent, utilities, and other expenses; and (3) the sum of deposits to the Karrasas' account and checks written by her to cover Mr. Karrasas' expenses, totaling $ 7,709 for 1974, $ 9,309 for 1975, and $ 1,623 for 1976, [6] should be deducted from petitioners' excess deposits. *115 In addition to credits for their cash hoard and Mr. Karrasas' funds, the Pappases explain that $ 3,000 of the excess deposits represents the repayment of a loan by Mr. Psarros (Mrs. Pappas' brother-in-law). In August of 1975, Mrs. Pappas wrote three checks of $ 1,000 each to Mr. Psarros -- a loan to enable him to do some work on his home. Mrs. Pappas testified that in late 1975 or early 1976 Mr. Parros repaid the loan and that she returned the $ 3,000 to her checking account. As we said in -- It is, of course, true that the existence of bank deposits, although not explained or accounted for in a satisfactory manner, does not of itself show that the sums deposited were or were not income. But where the Commissioner has determined that they were, the taxpayer has the burden of proving that the determination was wrong. See Rule 142(a). [7]
The determination of whether and in what amount the petitioners had unreported income in the years in issue ultimately *116 turns on our evaluation of the credibility of witnesses. We need not accept a witness' testimony as true even though it is uncontroverted; we are entitled to take into account whether it is improbable, unreasonable, or questionable. See, e.g., . Although the evidence indicates that the Pappases lived relatively frugally, we do not believe that they had accumulated savings in their basement safe of $ 50,000 on January 1, 1974. The Pappases presented no evidence to convince us that their earnings were sufficient or their expenses small enough to permit them to accumulate that significant an amount of cash. Additionally, at least as early as 1971, the Pappases had a savings account into which they made regular deposits and which had a balance of $ 8,426.41 on December 31, 1973. Although we are unable to determine precisely the amount of the Pappases' accumulated cash on January 1, 1974, based on the evidence presented, we believe that it was $ 20,000, of which $ 14,000 was deposited during 1974 and $ 6,000 during 1975. See. e.g., , affd. *117 per curiam ; , affd. sub nom. . [8]
We hold that the Pappases have not sustained their burden of proof with respect to the funds which they argue belong to Mr. Karrasas and those they contend are a loan repayment by Mr. Psarros. The Pappases presented no corroborating evidence from Mr. Karrasas or Mr. Psarros. Although Mrs. Pappas testified that she deposited Mr. Psarros' loan repayment of $ 3,000 in her checking account in late 1975 or early 1976, her account does not show a deposit of $ 3,000 during this time period. [9]
The existence of a joint bank account between Mrs. Pappas and Mr. Karrasas does not of itself prove whose funds *118 are in that account. In 1975, the deposits to that account were over 200 percent of what Mrs. Pappas testified Mr. Karrasas' annual wages were. Nor is there sufficient evidence by which we could find that some lesser portion of the Karrasas' account than the amount originally claimed actually belonged to Mr. Karrasas. As indicated above, we hold that respondent erred in not crediting the Pappases for deposits from their accumulated cash savings of $ 20,000. With respect to the remaining excess deposits, however (with one exception to be dealt with below), the Pappases have not sustained their burden of convincing us that those desposits represent anything other than distributions from their controlled corporation, Duttons. Respondent has asserted a deficiency against Duttons on the basis that the source of the Pappases' unreported income is Duttons', which it likewise has failed to report. Again, the petitioner, Duttons, bears the burden of proof with respect to the asserted deficiency. Rule 142(a). Duttons presented no evidence refuting the asserted deficiency except that offered to prove that the Pappases had no unreported income. Therefore, our finding of a deficiency *119 with respect to the Pappases inevitably brings us to the conclusion that Duttons has failed to satisfy its burden of proof. We hold that Duttons has unreported taxable income in the amount determined by the respondent reduced by the $ 20,000 of the Pappases' cash hoard. [10]
The Pappases contend that, should we uphold respondent's determination and find the source of their unexplained deposits to be diverted income of Duttons, we should allow them credit for those checks made payable to Duttons from the Pappases' personal accounts (the Duttons checks). Respondent denies credit for the Duttons checks on the theory that they are corporate distributions fully taxable to the Pappases and recontributions to Duttons' capital. It is well established that corporate funds received by shareholders may be taxed to those shareholders as a dividend even absent the formalities of a corporate dividend declaration *120 and payment. E.G., , affd. per curiam ; , affd. per curiam . As a result of our holding as to the cash hoard, petitioners had unreported income of $ 16,733.76 in 1974, $ 24,726.11 in 1975, and $ 9,266.09 in 1976. Our findings of fact show that the Pappases paid by check to Duttons the amounts of $ 7,600 in 1974, $ 2,850 in 1975, and $ 13,300 in 1976. Even if we assume arguendo that, because of the relationship between the Pappases and Duttons, the former received the funds under a claim of right (cf. , [11] the actual payments to Duttons are properly reductions in the income attributable to the Pappases for the respective years of repayment. , modified in other respects . Certainly, the Pappases should not be treated less favorably than they would have been treated had they been held to be embezzlers. See ; *121 . Duttons, however, has presented no evidence to show that the Pappases' checks to its stem from anything other than unreported corporate income. Thus, in determining Duttons' deficiency, no reduction is to be made for the Duttons checks. By way of summary: The Pappases' deficiency is credited for their cash hoard of $ 20,000 and the Duttons checks; [12] Duttons' deficiency is reduced only by the Pappases' cash hoard. Additionally, respondent seeks to disallow the dependency exemptions claimed by the Pappases for Mrs. Pappas' nieces. In order to be entitled to a dependency exemption, the Pappases, in addition to satisfying other requirements not at issue here, must have provided over half of each niece's support for each year involved. *122 Section 152(a). [13]
In order to carry their burden of proof, the Pappases must show both the total amount spent by all persons to support each niece and the amount spent by the Pappases to support each niece. . Mrs. Pappas' testimony is vague and sparse on these points. She testified that she bought some clothes for her nieces, who lived with their mother, that their mother was earning approximately $ 4,000 per year and also contributing toward their support, and that the children themselves were not employed. Petitioners produced only a compilation of their checks showing that they spent $ 207.88 in 1974, $ 800 in 1975, and $ 1,500 in 1976 for the support of their nieces. Based on the insufficiency of evidence presented, we hold that the Pappases *123 have not satisfied their burden of proof and are not entitled to dependency exemptions for Mrs. Pappas' nieces. See . Respondent has determined that petitioners' unreported income is taxable as follows: Duttons' income is fully taxable to it with no offsetting deductions; the Pappases' income is a dividend taxable as ordinary income. The petitioners presented no evidence of any additional deductions that should offset Duttons' income or of the absence of sufficient earnings and profits which would preclude the distributions from being taxable to the Pappases as ordinary income. See sections 316, 301. Therefore, with adjustments as discussed above for the cash hoard and the Duttons checks, respondent's determinations of the underlying deficiencies stand. We must next determine whether or not any part of the underpayment of tax for each year in issue was due to fraud within the meaning of section 6653(b). Respondent must establish petitioners' fraud by clear and convincing evidence. Rule 142(b). Respondent appears to base his claim of fraud on two points: the petitioners' failure to produce corroborating *124 witnesses to substantiate their claim that the excess deposits came from nontaxable sources, and the proposition that consistent understatements of income in substantial amounts over several years, standing alone, provide persuasive evidence of fraud. With respect to respondent's first point, we reiterate that respondent bears the burden of proof with respect to fraud and note that respondent has likewise failed to present witnesses, who appear to have been available, to refute Mrs. Pappas' testimony as to the nontaxable sources of petitioners' income. As regards respondent's second argument, we recognize that respondent has determined that Duttons and the Pappases have failed to report substantial amounts of income for each of the years in question, and to a large extent we have upheld his determinations. We have upheld those determinations, however, not because the record proves that petitioners had unreported taxable income, but because petitioners did not carry their burden of persuading us that the excess amounts determined by respondent were nontaxable. Therefore, although we agree with respondent that "consistent understatements of income in substantial amounts over a number *125 of years by knowledgeable taxpayers, standing alone, are persuasive evidence of fraudulent intent to evade taxes," , that principle is not applicable to the present case. [14] Respondent cannot meet his burden of proof on the basis of petitioners' failure to discharge their burden of proof with respect to the deficiencies. ; . The unexplained bank deposits are not in themselves clear and convincing evidence of fraud. . Additionally, we note that, although the absence of one or all of the following indicia is not conclusive evidence of the lack of fraud, respondent has failed to prove any of the following badges of fraud: excessive dealings in cash; the placement of assets in others' names; the holding of an unusually large number of bank accounts in a variety of locations; and failure to cooperate with respondent during the course of his investigation. *126 See ; ; . [15]
Based on the evidence presented in this case, including the testimony of the witnesses whom we saw and heard, and on the considerations discussed above, we hold that respondent has not sustained his burden of proving that petitioners' underpayments of tax were due to fraud. Accordingly, the Pappases and Duttons are not liable for the section 6653(b) additions to tax. Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent has conceded that there is no deficiency with respect to George T. Pappas and Voula G. Pappas for 1977.↩
3. Of these checks, $ 8,350 were written in Duttons' taxable year ended July 31, 1975, $ 6,400 in the year ended July 31, 1976, and $ 8,400 in the year ended July 31, 1977.↩
4. The differences in amounts are accounted for by the fact that Duttons was on a fiscal year and the Pappases were on a calendar year.↩
5. On brief, petitioners contend that, in addition to these three sources, they should be allowed a credit against the excess deposits for depreciation and a $ 200 dividend exclusion. This argument misses the mark. Depreciation deductions do not provide a source of cash to petitioners. Respondent has not challenged the petitioners' depreciation deductions. Although the Pappases properly reported net dividends of $ 292.51 on their 1976 return, respondent in his bank deposits analysis has credited the Pappases with gross dividends of $ 492.51.↩
6. We note that if Mr. Karrasas' funds were all deposited into the Karrasas' account, the Pappases would be entitled to a credit for the sum of those deposits. But to allow, as petitioners claim, an additional credit for expenses paid from those funds would be to allow a double credit.↩
7. See also , affd. without published opinion .↩
8. See also, , affd. per curiam ; , affd. .↩
9. Cf. , affd. .↩
10. See ; ; , affd. per order (9th Cir. April 20, 1973).↩
11. In another context, it has been held that amounts diverted by shareholders of a corporation are not embezzled funds. , affd. per curiam .↩
12. For the taxable year 1976, the credit is limited to the amount of the Pappases' unreported income for that year, i.e., $ 9,266.09.↩
13. Section 152(c) provides that under certain circumstances a group of persons who have jointly provided over half a dependent's support may designate one of their members to claim the dependency exemption. The Pappases do not contend, nor have they presented any evidence that would permit us to find, that they are entitled to dependency exemptions under section 152(c).↩
14. See .↩
15. See also ; , affd. per curiam .↩